UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MIKKEL S. AAES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-11-975 |
| | § | |
| 4G COMPANIES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending in this case are numerous motions to dismiss filed by various Defendants and five motions for default judgment filed by the Plaintiffs against five Defendants who, until very recently, had not filed a responsive pleading in this case. The pending motions are:

- Defendant Steve Rackley's motion to dismiss for failure to state a claim and motion to transfer venue. Doc. 10.

- Defendants S. Lavon Evans, Jr., Evans Energy LLC., and S. Lavon Evans, Jr. Operating Co. Inc.'s (collectively, the "Evans Defendants") motion to dismiss. Doc. 25.

- Defendant Justin Solomon's motion to dismiss. Doc. 32.

- Defendants EnerMax, Inc. ("EnerMax") and Bret Boteler's (collectively, the "EnerMax Defendants") motion to dismiss. Doc. 37.

- Defendant Brian Guinn's motion to dismiss. Doc. 51.

- Plaintiffs' motion for default judgment against Defendant 4G New Global Energy, LP. ("4G NGE"). Doc. 68.

- Plaintiffs' motion for default judgment against Defendant 4G Private Equity, LLC. ("4G PE"). Doc. 69.

- Plaintiffs' motion for default judgment against Defendant 4G Global Alternatives.

("4G GA"). Doc. 70.

- Plaintiffs' motion for default judgment against Defendant 4G Alternative Energy, LP. ("4G AE"). Doc. 71.

- Plaintiffs' motion for default judgment against Defendant Seisma Oil Research, LLC ("Seisma"). Doc. 72.

Having considered the motions to dismiss, the facts of this case, and the relevant law, the Court finds that the motions to dismiss should be granted. Further, the Court finds that Plaintiffs' original complaint fails to state a claim sufficient to meet the requirements of Rules 8 and 9(b). The Court therefore dismisses the Plaintiffs' complaint as to all Defendants, but grants the Plaintiffs leave to file an amended complaint that satisfies the pleading requirements of the Federal Rules.

On March 2, 2012, Defendants 4G Companies, 4G Private Equity, LLC, 4G Global Alternatives, LLC, 4G New Global Energy, LP, 4G Alternative Energy, LLC (collectively, the "4G Defendants"), and Brian Guinn, who previously had not properly filed an answer or made an appearance in this case, filed a motion through their attorney for leave to late-file an answer to Plaintiffs' original complaint. Doc. 78. Because these Defendant now have obtained counsel and filed an appearance, Plaintiffs' motions for default judgment against the 4G Defendants (Docs. 68-71) are denied. Although Seisma has failed to file an appearance or respond in any way to the pending litigation against it, because the Court has determined that Plaintiffs' complaint should be dismissed, Plaintiffs' motion for default judgment against Seisma (Doc. 72) is denied without prejudice to Plaintiffs' right to re-urge the motion after filing an amended complaint and serving it on Seisma.

Background

Plaintiffs, a group of foreign individuals, filed this action in the Southern District of Texas against Defendants, a group of Texas, Florida, and Mississippi corporations, partnerships, and individuals, on March 16, 2011. Doc. 1. Plaintiffs are 121 individuals who reside in and are citizens of various foreign countries. *See* Doc. 1 at 4-14. They assert causes of action arising out of economic damages they suffered when they purchased allegedly fraudulent shares in Texas oil and gas ventures sold by the Defendants.

Defendants are:

- Brian Guinn: A Texas citizen who resides in Plano, Texas and, Plaintiffs allege, is the president of one or more of the 4G Defendants.

- The 4G Defendants: Four Texas corporations headquartered in Dallas, Texas.[1]

- Justin Solomon: A Florida citizen residing in Deerfield Beach, Florida and the registered agent and director or corporate officer of Seisma Oil Research, LLC.

- Seisma Oil Research, LLC: A Florida limited liability company.[2]

- Bret Boteler: A Texas citizen who resides in Arlington, Texas and is the president and registered agent of EnerMax.

- Steve Rackley: A Texas citizen who also resides in Arlington, Texas and is the CEO of EnerMax.

- EnerMax: A Texas corporation headquartered in Hurst, Texas.

---

[1] Plaintiffs additionally named "4G Companies" in their complaint. The 4G Defendants have asserted that "4G Companies is not a legal entity." Doc. 78. There is no apparent record of a "4G Companies" in the database of Texas Corporate Records and Business Registrations.

[2] The docket sheet in this case lists two Seisma Defendants: Seisma Oil Research, LLC and Seisma Energy Research AVV a/k/a Seisma Oil Research AVV. Plaintiffs' complaint refers only to a single entity listed as Seisma Oil Research, LLC a/k/a Seisma Energy Research, LLC. Because of the apparent confusion surrounding the legal status or existence of these entities, the Court throughout this opinion uses "Seisma" to mean any or all of these Defendants and entities.

- S. Lavon Evans, Jr. A Mississippi citizen who resides in Laurel, Mississippi. Evans evidently is the director or corporate officer of Evans Energy, LLC and S. Lavon Evans, Jr. Operating Co., Inc.

- Evans Energy, LLC: A Mississippi Limited Liability Company headquartered in Laurel, Mississippi; and

- S. Lavon Evans, Jr. Operating Co., Inc.: A Mississippi corporation headquartered in Laurel, Mississippi.

<u>Creation of the Scheme</u>

In their original complaint, Plaintiffs state that this case arises out of a scheme by which Defendants fraudulently offered, marketed, and sold shares in "joint ventures, which were purported to be formed under Texas law, [and] purported to engage in the business of owning and operating working interests in oil and gas wells in Yoakum County, Webb County, Liberty County and Live Oak County, Texas." Doc. 1 at 17-18.

Plaintiffs allege that Seisma Operating Oil Research, LLC was incorporated in July, 2007 in Boca Raton, Florida. Doc. 1 at 18. They further allege that Seisma Energy Research was incorporated in 2009, "when SOR supposedly, and without any notice to investors, relocated to Aruba." *Id.* at 19. Plaintiffs do not identify *who* incorporated either entity, nor do they state where Seisma Energy Research was incorporated. They do, however, allege that Defendant Solomon "is the president and managing partner of SOR and controls Seisma Energy Research and Permian."[3] According to the Plaintiffs, Solomon met with EnerMax and the Evans Defendants in September, 2007. *Id.* at 20. These parties formed an arrangement for Seisma to purchase working interests in oil wells owned by EnerMax and the Evans Defendants in Texas.

---

[3] Plaintiffs do not identify "Permian," nor is it named as a Defendant in this case.

Despite Seisma paying for these interests, Plaintiffs allege that EnerMax and the Evans Defendants did not sell any working interest to Seisma. *Id.*

Plaintiffs allege Defendants Solomon and Seisma created six joint ventures to invest in six different oil wells originally owned by EnerMax and the Evans Defendants. In an attempt to be concise, the Court confines itself to one illustrative example:

Seisma created a joint venture, McKenzie Draw #1 Joint Venture, to acquire a 20% interest in the McKenzie Draw #1 oil and gas lease owned by EnerMax. *Id.* at 24. Seisma was the "managing venturer" of the McKenzie Draw #1 Joint Venture. *Id.* Seisma issued a term sheet for the joint venture on March 1, 2008, which stated that the offering would be limited to twenty units, or joint venture interests, at $228,000.00 per unit. *Id.* "Fractional shares were available . . . [for] $6,562.50." *Id.*. Further, the "Term Sheet stated that upon termination of the offering, [Seisma] would issue the Joint Venture interests to subscribers subject to the terms and condition of a Joint Venture Agreement to be signed by all accepted subscribers. Pursuant to the Term Sheet [Seisma] was to receive a one time due diligence and management fee of $50,000. The remainder of the investment dollars was to be allocated for the purchase of the McKenzie Draw #1 JV working interest." *Id.* Seisma represented in that term sheet that it had a contractual right to purchase up to 20% of the working interest of the well from its owner, EnerMax. *Id.* Plaintiffs additionally allege that "EnerMax and Seisma are partners on several oil and gas ventures on or near the well" and that Permian, "an Aruba broker-dealer and affiliate of [Seisma]" which sold the fractional interests, "advertized" that EnerMax and the Evans Defendants were its "industry partners." *Id.* at 24, 26.

Plaintiffs state that Seisma "was obligated[4] to enter into a Participation Agreement with

---

[4] Plaintiffs do not identify the source of this obligation, but the Court assumes they are referring to provisions of the Term Sheet.

the Joint Venture wherein [Seisma] would assign the working interest to the Joint Venture and cause the initial well to be drilled [and operated] on a turnkey basis" by EnerMax. *Id.* at 25. "Title to the working interest on the property was to be placed in the name" of the joint venture and "no partner (other than managing partner or a vote of the partners [of the joint venture]) [had] any right or authority to take any action on behalf of the Joint Venture." *Id.* Solomon and Seisma made identical arrangements with EnerMax for three other wells and with the Evans Defendants for two other wells. *Id.* at 25-26.

Plaintiffs allege that Solomon and Seisma did, in fact, use funds obtained from investors to purchase working interests in the wells from EnerMax and the Evans Defendants, but that the assignment of the working interest was to Seisma or Solomon; not to the joint ventures. *Id.*

Plaintiffs assert some scant additional claims against EnerMax and the Evans Defendants. Specifically, Plaintiffs claim that at the time of the investment, "Evans Energy was advertising as an operator [of oil wells, but] it had no license from the Texas Railroad Commission. Rather it was using the operator license of S. Lavon Evans, Jr. Operating Co., Inc.," and that Plaintiffs attempted to contact EnerMax and the Evans Defendants after they invested but have been largely unsuccessful. *Id.* at 26. In their only successful communication with Steve Rackley, CEO of EnerMax, Rackley told investors that "Seisma was a legitimate company." *Id.* at 27. Apparently in response to Plaintiffs' efforts to contact EnerMax and the Evans Defendants, Seisma's attorney "sent Plaintiffs cease and desist letters based solely on the Plaintiffs desire to learn about the status of their investments." *Id.*

Finally, Plaintiffs make various allegations about the role of the 4G Defendants. Plaintiffs allege that, at some point in 2008, "4G Companies[5] [became] the custodian for [Seisma]" and

---

[5] Plaintiffs do not specify whether they mean all the 4G companies named in this case or a single entity known as "4G Companies." Because there is no record of a "4G Companies" registered or doing business in Texas (*see* n.1),

"began assisting [Seisma] with its joint venture operations. The duties [that the 4G entities undertook] included the handling of all of [Seisma's] joint venture revenue distribution, customer communications and general business duties." *Id.* In 2010, apparently in response to investors' requests for information from EnerMax and the Evans Defendants, "4G's president, Brian Guinn, admitted that Bret Boteler had assigned Enermax's working interests to [Seisma] directly and not to the joint ventures." *Id.*

<u>The Marketing and Investment Process</u>

Plaintiffs describe a marketing plan by which Solomon, through Seisma, aggressively marketed and sold shares or units in joint venture investments in the oil wells that were the subject of Solomon's agreements with EnerMax and the Evans Defendants. *Id.* Solomon and Seisma established various websites from which potential investors could purchase these shares. *Id.* Solomon and Seisma "further marketed the investment through an infomercial broadcast on various cable stations in the United States beginning in March 2009" which directed viewers to a website, www.seismaoilresearch.com, from which investors could purchase shares or units in the joint ventures.[6] *Id.* Additionally, "Solomon [and Seisma]. . . used salesmen in boiler rooms located in Costa Riva and Thailand to pitch investors." *Id.* at 21. The salesman in these "boiler rooms" used high-pressure sales tactics and "pressed investors to make quick investment decisions" and misrepresented to investors that they were calling from Seisma's Boca Raton office when they were, in fact, calling from call centers in Costa Rica and Thailand. *Id.*

Plaintiffs additionally allege that

the Court reads "4G Companies" to refer to the various, real entities doing business under the "4G" moniker: 4G New Global Energy, LP, 4G Private Equity, LLC, 4G Global Alternatives, and 4G Alternative Energy, LP.
[6] The Court notes that none of the Plaintiffs are residents of the United States. Plaintiffs do not allege that any of the Plaintiffs were present in the United States when these infomercials were broadcast, nor do they allege that they were able to or did access these broadcasts or reproductions thereof outside of the United States. They do allege that "[t]he Seisma Websites [sic] gave broadcast times and carried clips from the infomercial." *Id.* at 21.

"defendants and their salesman . . . made the following false and
misleading statements [to investors] . . . (a) investors would receive a quick return
of their investment; (b) the wells were already producing or would quickly begin
production; (c) investors would receive monthly production payments of $10,000
to $15,000; (d) Credit Suisse, Exxon Mobil, and sovereign wealth funds were
investing in the joint venture wells or were partnering with the well operators; (e)
investors can sell their units for three or four times their purchase price; and (f)
sales commissions were just 1% of the investment, (g) the joint ventures would be
formed, and (h) the joint ventures would own working interests in the wells set
forth in the subscription agreement."

Id. at 18.

Plaintiffs do not, however, state with any specificity which of these statements were
made to which Plaintiff, when these statements were made, nor whether they were made during
the course of phone sales, on the cable television infomercials, or on Defendants' websites.
Nevertheless, Plaintiffs assert that "[d]ue to their unsolicited high-pressure selling efforts, . . .
[Seisma] and Solomon have . . . been the subject of regulatory orders/warnings by foreign
securities regulators." *Id.* at 22.

Prior to any purchase of joint venture units, Solomon and Seisma provided investors "a
program summary, subscription agreement, and an invoice for investment. The program
summary contained geologic and technical information about the drilling prospect, and listed a
mailing address for [Seisma] in Florida. The subscription agreement set forth, among other
things, the payment obligations of investors for drilling, testing and completion expenses. The
invoice described the amount of investment, provided wire instructions, and listed an
'administration fee' of 1% of the investment amount." *Id.* at 23. After they invested, investors
who requested more information obtain "a more complete term sheet" from Solomon and Seisma
which revealed that these Defendants intended to use "as much as 35% of the offering proceeds
for sales commissions and marketing expenses . . . [and] retain 25% of the proceeds as a
management and due diligence fee." *Id.* These terms sheets "were inconsistent with oral

representations made by Solomon . . . [and Seisma] and their salesmen, as well as the written invoices provided to investors." *Id.*

Plaintiffs allege that "Solomon [and Seisma] . . . received approximately $25 million from 400 investors in 32 countries. Of the $25 million raised from investors, just $9.5 million (38%) was used to acquire working interests in oil and gas wells on behalf of Solomon [and Seisma,]. . . $10 million (40%) was used to pay sales commissions and marketing expenses, and the remaining $5.5 million (22%) was expended on boating, automobile and various expenses associated with running the scheme." *Id.* at 28. Solomon and Seisma did use some of the funds to purchase working interests in the wells, but those interests were acquired in the name of Solomon and Seisma, not in the name of the joint ventures as Defendants purportedly promised they would be.

Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b) (6). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office,* 530 F.3d 368, 372 (5th Cir. 2008). Under Rule 8(a)(2), plaintiffs are not required to include "'detailed factual allegations,' but more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation' is needed." *Id.* (quoting *Twombly,* 550 U.S. at

555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556).

Allegations of fraud, however, must meet the stricter standards of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The particularity required for such pleading, however, varies from case to case. *See Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir.2003). The Fifth Circuit has reasoned that "[a]t a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs.,* 343 F.3d at 724.

More precisely, Rule 9(b)'s particularity requirement compels that "the who, what, when, where, and how [ ] be laid out." *Benchmark Elecs.,* 343 F.3d at 724. "Claims alleging violations of . . . the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to [Rule 9(b)'s] requirements." *Frith v. Guardian Life Ins. Co. of Am.,* 9 F.Supp.2d 734, 742 (S.D.Tex. 1998); *see also Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 368 (5th Cir. 2001) (noting that "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not.").

<u>Analysis</u>

In their original complaint, Plaintiffs assert the following causes of action against all Defendants:

1. Violation of Section 1962(c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq.* Doc. 1 at 29.

2. Forming a conspiracy to violate Section 1962(c) of the RICO, as is prohibited by Section 1962(d) of that Act. *Id.* at 33.

3. Violations of the Texas Deceptive Trade Practices Act ("DTPA"). TEX. BUS. & COMM. CODE § 17.41, *et seq. Id.* at 34.

4. Breach of contract, unjust enrichment, and detrimental reliance. *Id.* at 35.

5. Breach of fiduciary duty. *Id.*

6. Fraud. *Id.*

7. Securities fraud and aiding and abetting securities fraud. *Id.* at 36.

8. Civil conspiracy. *Id.* at 37.

9. Fraud in the inducement. *Id.*

10. Violation of the Texas Theft Liability Act. TEX. CIV. PRAC. & REM. CODE § 134.001 *et seq. Id* at 38.

11. Money had and received. *Id.* at 39.

12. Conversion. *Id.*

13. Conspiracy. *Id.*

14. Constructive trust. *Id.* at 40.

The Court disposes at the outset certain of Plaintiffs' claims with which they clearly cannot proceed against any Defendant. Two of Plaintiffs' claims appear to be asserted in error. First, the Plaintiffs have asserted a cause of action for conspiracy twice–Causes of Action Eight and Thirteen–and therefore strikes Plaintiffs' thirteenth cause of action for conspiracy as needlessly duplicative. Second, "[a] constructive trust is a remedy imposed upon property

obtained by fraudulent means," not a cause of action. *Ins. Distributors Intern. (Bermuda) LTD. v. Edgewater Consulting Group*, 2010 WL 3522312 * 16 n.29 (W.D.Tex. 2010) (citing *Thigpen v. Locke*, 363 S.W.2d 247 (Tex.1962)). The Court therefore strikes Plaintiffs' fourteenth cause of action for a constructive trust.

Additionally, Plaintiffs' claim for conversion clearly is inapplicable in this case. In Texas, a cause of action for conversion of money exists "only when [the money] is in the form of specific chattel, such as old coins, or when 'the money is delivered to another party for safekeeping, the keeper claims no title, and the money is required and intended to be segregated, either substantially in the form in which it was received or as an intact fund.'" *Mitchell Energy Corp. v. Samson Resources Co.*, 80 F.3d 976, 984 (5th Cir. 1996) (quoting *Dixon v. State*, 808 S.W.2d 721, 723 (Tex.App.-Austin 1991)). Plaintiffs have stated here that they are seeking the return of investment funds that subsequently have been used to purchase oil well working interests, spent on marketing and Defendants' salaries, and used to purchase boats and other luxuries. Doc. 1. Because Plaintiffs have admitted that the funds they seek are neither in the form of a specific chattel nor in the form in which they were received, their claim for conversion must be dismissed.

Finally, Plaintiffs assert claims for securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 of the Securities and Exchange Commission ("SEC") against all Defendants. Doc. 1 at 36. In *Morrison v. Nat'l Australia Bank Ltd.*, the Supreme Court rejected the 'conduct or effect' test that previously had been used to determine the extraterritorial application of US securities laws and limited 10(b)'s extraterritorial reach to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." —––U.S. —––, —––, 130 S.Ct. 2869, 2888, 177 L.Ed.2d 535

(2010). *See also In re BP p.l.c. Securities Litigation*, --- F.Supp.2d ----, 2012 WL 432611, *67 (S.D. Tex. 2012).

Here, Plaintiffs are 121 foreign citizens and residents. Although the complaint does not describe the details of each investment in or purchase of a share of a joint venture, the facts that the Plaintiffs have alleged indicate that every transaction underlying this case was entirely foreign. The Plaintiffs are all foreign citizens and, it appears, were at all relevant times in foreign countries. "Solomon and his entities employed high-pressure salesmen *located in offshore boiler rooms* to contact investors. . . . If a potential investor expressed an interest in investing, the qualifiers transferred the call to a 'closer.' The closers would complete the sale." Doc. 1 at 18, 22 (emph. added). There is no indication that any of the transactions in this case took place domestically. Because the transactions complained of in this case fail to satisfy the domesticity requirement of *Morrison*, Plaintiffs' claims for securities fraud must be dismissed.

<u>Rackley, Boteler, EnerMax and the Evans Defendants' Motions to Dismiss</u>

Defendants Steve Rackley, the Evans Defendants, Bret Boteler, and EnerMax (the "owner/operator Defendants") all have moved to dismiss Plaintiffs' claims against them. Docs. 10 (Rackley), 25 (Evans Defendants), 37 (Boteler and EnerMax). The essence of these Defendants' motions is that the sparse allegations Plaintiffs have made against them do not demonstrate Defendants involvement in any part of the purportedly unlawful or fraudulent conduct. The Court agrees.

The extent of Plaintiffs' allegations against Rackley, Boteler, EnerMax, Evans, Evans Energy, and Evans Operating Co. is that they originally owned the oil and gas wells which other Defendants purchased from them. Plaintiffs have not alleged that these Defendants ever made contact with the Plaintiffs, that they were involved in the marketing, advertising, or formation of

joint ventures for investment purposes, or that they played any role in organizing the investment opportunities that other Defendants offered to foreign investors. In fact, the sole allegation of any contact between Plaintiffs and these Defendants is the single incident in which some Plaintiffs contacted Rackley to demand information about their investments, and that he told these Plaintiffs that "Seisma was a legitimate company." Doc. 1 at 27. The extent of the facts alleged by Plaintiffs against these Defendants is that they were owners and operators of oil and gas wells that Solomon, Seisma, or the 4G Defendants may have purchased with funds that may have been fraudulently obtained. Plaintiffs have asserted no facts to indicate, nor even made the claim, that the owner/operator Defendants knew the funds used to purchase working interests were obtained fraudulently. Plaintiffs therefore have failed to state a claim against these Defendants for the substantive causes of action alleged in their complaint.

Although Plaintiffs have not alleged any facts indicating that these Defendants are liable for an independently wrongful offense,[7] the Defendants would still be liable for any wrongful acts done by co-Defendants in furtherance of a conspiracy, under either common law or the federal RICO statute, to which the owner/operator Defendants were a party. *See Cadle Co. v. Schultz*, 779 F.Supp. 392, 400 (N.D.Tex. 1991) ("Under RICO, one co-schemer is liable for the other co-schemers' predicate acts. Indeed, upon joining a fraudulent conspiracy, each defendant becomes liable for the prior conduct of the earlier conspirators, and remains liable for the subsequent conduct of the other conspirators."); *In re Arthur Andersen LLP*, 121 S.W.3d 471, 482-83 (Tex.App.–Houston [14 Dist.] 2003) ("Once a conspiracy is proven, each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination."). Plaintiffs have not, however, pled any fact that establishes the owner/operator

---

[7] Specifically, for the offenses based in breach of contract, breach of fiduciary duty, fraud, wire fraud, securities fraud, and theft. *See* Doc. 1.

Defendants were party to a conspiracy.[8]

      "To demonstrate a civil RICO conspiracy, a claimant must show that:(1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense." *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. 2012). Under Texas law, "[a] claim for civil conspiracy has five elements: (1) two or more persons; (2) have an objective to be accomplished; (3) a meeting of the participants' minds on the objective or course of action; (4) one or more unlawful, overt acts; and, (5) resulting damages." *Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 124 (5th Cir. 1993) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). To demonstrate conspiracy under either RICO or Texas law, a plaintiff must therefore plead that the defendants had some knowledge of the purpose of the conspiracy and agreement to act in furtherance thereof. *See also Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1969) ("One without knowledge of the object and purpose of a conspiracy cannot be a co-conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of."). Here, the Plaintiffs have not advanced any claim that Rackley, Boteler, EnerMax, or the Evans Defendants knew of the existence of a conspiracy to defraud potential investors nor that they agreed to join in such acts. Nor do any of the facts in their complaint support such a conclusion. Because nothing in Plaintiffs' complaint indicates the involvement of Rackley, Boteler, EnerMax, or the Evans Defendants in any alleged wrongdoing, the Court grants these Defendants' motions to dismiss.

---

[8] Because Plaintiffs assert that Defendants conspired to commit fraud and other offenses that contain elements of fraud, their claims must be pled with the specificity required by the heightened pleading standards of Rule 9(b). *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) ("a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy'") (quoting *FC Inv. Group LLC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C.Cir. 2008)).

<u>Justin Solomon's Motion to Dismiss</u>

Solomon's motion to dismiss (Doc. 32) is based entirely on the preclusive effect of *Morrison* to foreign securities transactions. Because the Court already has determined that Plaintiffs' securities claims based on foreign transactions must be dismissed, Solomon's motion to dismiss Plaintiffs' Securities and Exchange Act claims against him is granted.

<u>Brian Guinn's Motion to Dismiss</u>

Finally, Defendant Brian Guinn, who is proceeding *pro se* and who Plaintiffs allege is the President of one or more of the 4G Defendants, moves to dismiss Plaintiffs' claims against him on the grounds that "[t]he complaint does not allege that Defendant Guinn did anything wrong or caused any of the Plaintiff's [sic] any harm." Doc. 51 at 2. Although Guinn's argument is decidedly brief and unadorned, the Court agrees. Plaintiffs' claims against Guinn or the 4G defendants are the following allegations:

> "4G Companies is the custodian for [Seisma]. Beginning in 2008, 4G began assisting [Seisma] with its joint venture operations. The duties included handling all of [Seisma's] joint venture distribution, customer communications and general business duties.
> Plaintiffs have made demand on 4G to provide information to them regarding their joint venture investment. 4G has refused to provide any information.
> . . .
> In 2010, 4G's president, Brian Guinn, admitted that Bret Boteler had assigned Enermax's [sic] working interests to [Seisma] directly and not to the joint ventures.
> . . .
> 4G knew about the failure [to assign the working interest to the joint venture] and participated in the scheme to use Plaintiffs' monies for their own purposes.
> . . .
> Brian Guinn [and] 4G . . . received investor funds from Solomon and his companies."

Doc. 1 at 27-29.

Plaintiffs do not elaborate on the concept of 4G's "custodianship" of Seisma. Whether

this custodianship involved a corporate merger, a purchase, a change in management, or any other relationship that might give rise to an inference of control and, hence, responsibility is not at all clear from the complaint. Plaintiffs' additional factual allegations that Guinn "admitted that Bret Boteler had assigned Enermax's [sic] working interest" to Seisma and not the joint ventures and that he received investor funds fail to establish his liability for any of Plaintiffs' causes of action. As the Court discussed above, a Defendant's liability for underlying offenses could be predicated on his participation in a common law or RICO conspiracy, but Plaintiffs once again fail to allege any fact that indicates that Guinn knew of or agreed to join a conspiracy. Plaintiffs have not alleged that Guinn agreed in the objective of any underlying conspiracy, nor that he knew of an unlawful scheme to defraud investors or otherwise commit unlawful acts. Because Plaintiffs have failed to allege facts that demonstrate Guinn is liable for any of their causes of action, Guinn's motion to dismiss is granted.

<u>Plaintiffs' Complaint Fails to State a Claim Against Any Defendant</u>

Finally, the Court finds that Plaintiffs' complaint fails to satisfy the pleading requirements of Rules 8 and 9(b) and therefore must be dismissed as to all Defendants. As the foregoing discussion shows, Plaintiffs' complaint is unclear as to the roles of various Defendants in the purported conspiracy, whether they actively agreed to participate, and what actions they may have taken in furtherance thereof. Further, the Complaint does not reveal whether the investors in this case were induced to purchase joint ventures shares on the basis of the Defendants' websites, cable television advertizing, telephone marketers, or sales pamphlets. Put simply, the sparse and conclusory complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

The Court also notes that many of Plaintiffs claims are governed by the stricter pleading

requirements of Rule 9(b). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Claims alleging violations of . . . the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to [Rule 9(b)'s] requirements." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F.Supp.2d at 742. Here, Plaintiffs' RICO claim and their claim to form a RICO conspiracy, their claim under the DTPA, their claims for fraud, fraud in the inducement, and for conspiracy to commit fraud are all governed by the heightened pleading standards of Rule 9(b).

"At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs.*, 343 F.3d at 724. Here, Plaintiffs' complaint is characterized by broad allegations common to all Defendants and all Plaintiffs. Without more, Plaintiffs' complaint fails to satisfy the heightened pleading standard of Rule 9(b) as to their claims alleging fraud or containing elements of fraud.

Conclusion

For the foregoing reasons, the Court hereby

**ORDERS** that Defendant Steve Rackley's motion to dismiss for failure to state a claim (Doc. 10); Defendants S. Lavon Evans, Jr., Evans Energy LLC., and S. Lavon Evans, Jr. Operating Co. Inc.'s motion to dismiss (Doc. 25); Defendant Justin Solomon's motion to dismiss the Securities and Exchange Act claims against him (Doc. 32); Defendants EnerMax, Inc. and Bret Boteler's motion to dismiss (Doc. 37); and Defendant Brian Guinn's motion to dismiss (Doc. 51) are **GRANTED**. Further, the Court

**ORDERS** that Plaintiffs' complaint (Doc. 1) is **DISMISSED** without prejudice to

Plaintiffs' right to file an amended complaint that complies with the pleading standards of Rule 8 and 9(b). Because the 4G Defendants have responded to Plaintiffs' complaint and filed an appearance in this case, the Court

**ORDERS** that Plaintiffs' motions for default judgment against these parties are **DENIED**. Further, because the Court has determined that Plaintiffs' original complaint fails to state a claim against any Defendant, the Court

**ORDERS** that Plaintiffs' motion for default judgment against Defendant Seisma (Doc. 72) is **DENIED**.

SIGNED at Houston, Texas, this 20th day of March, 2012.

_Melinda Harmon_
MELINDA HARMON
UNITED STATES DISTRICT JUDGE